IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| JOSEPH D. AVERZA, | * | |
|     Plaintiff | * | |
| v. | * | Civil Action No. WDQ-02-620 |
| 3D INTERNATIONAL, INC., | * | |
|     Defendant | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**JOINT PRETRIAL ORDER**

Pursuant to this Court's Scheduling Order, the following is the parties' proposed Pretrial Order in this action.

**1.    Plaintiff's Brief Statement of Facts and Legal Theories in Support of his Position**

Averza is a construction supervisor with several years of experience in the construction trades. He began working for 3D/I International, Inc.'s ("3D/I") Los Angeles office in September 1999. He was assigned to several different projects while at 3D/I's Los Angeles operation, including a beautification project for the city's main airport, and some renovation work for the Community College system. In November 2000 he was granted a transfer to Maryland, where he worked primarily on a project for the Baltimore County School system. He left 3D/I in protest over abusive treatment by his supervisor in March 2001. While he worked at 3D/I in both California and Maryland, Averza claims entitlement to overtime compensation, which was not paid to him with one exception. 3D/I claims entitlement to reimbursement for

1

Averza's relocation expenses from California to Maryland, since he did not work for an entire year for 3D/I after moving to Maryland.

3D/I provides construction consulting services to clients engaged in non-routine construction projects, for which they have no need of a permanent workforce. 3D/I provides personnel who oversee the projects, monitor compliance with contract issues, track scheduling, attend construction meetings, and report to the client.

Averza's work for 3D/I comprised four main projects. In California, Averza worked on a beautification project at the Los Angeles airport, on a project to catalog renovation needs at certain community colleges, and on preliminary plans for a townhouse project. In Maryland, Averza primarily worked on a project with the Baltimore County school system's efforts to abate asbestos problems in its schools.

Averza worked on 3D/I's client production. He did not have administrative responsibilities, such as payroll, business policies, marketing, business production, or managing an office. Averza did not run any of the projects, nor did he supervise any employees, other than to accept reports from the Maryland employees. He had no hiring or firing authority. He did not exercise discretion or independent judgment in his work. His tasks were primarily those of observing, reporting, and monitoring field progress against plans and schedules formulated by others.

Averza generally worked sixty hours per week, contrary to the representations made to him prior to his hire, because of insufficient staffing. He also was seldom able to take a lunch break. Despite his request for fewer hours and for overtime pay for the hours he worked that

exceeded 40 per week, Averza was paid a set amount, termed "salary." He was told on the Baltimore County project that there was no room in the company's budget for overtime pay.

On January 25, 2001, Averza's supervisor's supervisor, Don Thomas, signed a payroll notice to change Averza's employee classification to exempt. Averza was never consulted about this change and did not agree to it. Averza left the company about five weeks later.

Under the Fair Labor Standards Act, Averza is entitled to overtime pay for all hours worked over 40 per week, unless he is exempt from such overtime provisions. Defendant bears the burden of proof, by clear and convincing evidence, that Averza actually performed exempt work for it. No one contends that Averza met the professional, computer professional, or outside sales exemption. 3D/I erroneously attempts to classify Averza's job as executive, administrative, or a combination thereof. Averza's actual job duties, however, do not meet the tests set forth in the law or the administrative regulations, and he is entitled to overtime pay.

As to Defendant's counterclaim, Averza is not liable to repay the relocation expenses because of 3D/I's breach of the contract by permitting the maintenance of an abusive, unprofessional and hostile work environment, and its unwillingness, despite initial positive statements, to reassign him to another project.

**2.    Defendant's Brief Statement of Facts and Legal Theories in Support of Each Affirmative Defense and its Counterclaim**

Defendant 3D/International, Inc. is a corporation that provides professional services in the areas of project management, design engineering and environmental services. It designs, builds and manages projects for government, commercial and institutional clients.

3

In or about September of 1999, 3D/I hired Plaintiff Joseph D. Averza ("Mr. Averza") as a general project manager. His qualifications included a college degree in business administration and 15 years of training and experience in the construction industry, and featured several years in the positions of Vice President and Project Manager at Joseph Averza & Sons Construction Company.[a] His offer letter from 3D/I specified that he would receive a fixed salary in excess of $100,000 per year, and that he would **not** be eligible for overtime compensation.

### a. Mr. Averza's Position on the Los Angeles World Airport Beautification Project

Shortly after his arrival at 3D/I, Mr. Averza began work as Senior Construction Manager on a multi-million dollar beautification project at the Los Angeles World Airport ("LAX").[b] Mr. Averza worked on this project from November 8, 1999 to December 1, 2000. As the self-described "point person" for that project, he had overall responsibility for the Gateway Enhancement Project at LAX. His duty was to ensure that the work continued on schedule and in a satisfactory manner on this high-profile $30 million project for 3D/I.

Mr. Averza designed and produced monthly progress reports to the client, and served as the primary contact person to review the project and its status with local government agencies.[c] He also reviewed and made recommendations to the client, commented on pay requests from the contractor, and provided merit and cost analyses on change orders/claims. Throughout the

---

[a] Mr. Averza admitted that he was not designated eligible to receive overtime compensation in his previous positions in the construction industry.

[b] The Company provided construction management services on a series of renovations to that area's largest airport.

[c] Mr. Averza drafted a detailed summary of the responsibilities he performed for 3D/I over the course of his employment.

4

project, he remained in regular contact with the project's general manager through weekly status meetings, informal correspondence, and personal visits to the jobsite, during which he offered guidance or criticism at his discretion. He also helped negotiate sub-consultant agreements with 3D/I sub-consultant firms, evaluated the performance of the general contractor, and produced cost estimates for the client as necessary.

Mr. Averza had substantial authority with respect to supervisory matters at 3D/I in his position on the Gateway Enhancement project. He trained employees, directed their work, handled their complaints, disciplined them when necessary, and planned the work on the Gateway Enhancement Project.

      **b.**     **Mr. Averza's Position on the Los Angeles Community Colleges Project**

Upon completion of the Los Angeles Airport Gateway Enhancement project, Mr. Averza served as a Property Assessor on the Los Angeles Community Colleges project. This position began on September 8, 2000 and continued through November 10, 2000. In this position, Mr. Averza made visits to nine local colleges to inspect and determine the structural deficiencies of a series of buildings, in order to establish the cost of repairing and improving those buildings. He reviewed and analyzed approximately 65 to 75 buildings over the course of the project, and the inspection covered structural conditions, paint coverage, and other facility maintenance. Mr. Averza brought substantial expertise and experience to this position, in which he was responsible for assessing the structural conditions of these buildings. At the conclusion of his review and analysis, he prepared a report that summarized his findings. When a final assessment was submitted to the Los Angeles Community Colleges District, he was responsible for those

portions of the report that corresponded to the campuses he had visited. Mr. Averza also reviewed submittals and other related paperwork for the Architects/Engineers team, and inspected and reviewed the work of the contractors in the field on a regular basis.

### c.     Mr. Averza's Position on the Baltimore County Public School Renovation Program

In or around November of 2000, Mr. Averza requested a transfer to 3D/I's Baltimore office, which the Company granted. Mr. Averza was hired as an Area Project Manager on the Baltimore County Public Schools Renovation Program[d], which aimed to improve the facilities at over 45 Baltimore County Public schools.[e] Mr. Averza worked on the Baltimore County Public Schools project from December 15, 2000 until his resignation on March 9, 2001. In that role, he was responsible for reviewing submittals, Requests for Information ("RFI's"), job progress reports and other correspondence, as well as change quotations from designated contractors. In addition, he was responsible for approximately 45 schools, which he visited regularly, and was entrusted with coordinating his responsibilities with Baltimore County and the architectural team assigned to each school. Mr. Averza also provided written reports, known as change order analyses, in which he reviewed submissions from the general contractor and Baltimore County, determined whether the ideas or modifications were permitted under the contract, studied their potential impact, determined if sufficient financial resources were available, and made an

---

[d] The program was a joint venture with Parsons-Brinckerhoff. At the project manager level, three different entities, 3D/I, Parsons-Brinckerhoff and another subcontractor, Indem Engineers, all contributed employees who were working together on the project.

[e] Individual inspectors were assigned to verify that contractors complied with contract drawings and specifications. Generally, one inspector was assigned for every two schools. A project manager had supervisory responsibility for inspectors at 4 to 5 schools and each Area Manager was assigned as the supervisor for three to five project managers.

6

appropriate recommendation. These impact and feasibility assessments played an important role in determining whether modifications to original project designs were approved, and his ability to provide quick and competent recommendations, without the need for supervisory review, was invaluable to 3D/I. He also reviewed payment requests from the contractors and then recommended to the County which requests should be paid and which should be rejected. As an Area Project Manager, he also served as a mentor, teacher, and trainer to the various project managers, making recommendations and offering other guidance as necessary.

Mr. Averza also possessed authority over personnel matters in Baltimore. He supervised three project managers in their renovation of 45 schools in Baltimore County. He clearly was responsible for directing their work. He also was required to report to the Construction Manager whether his Project Managers were performing effectively. Based on his recommendation, the Construction Manager could impose discipline. He also was able to make recommendations with respect to Company hiring and firing.

### d. Plaintiff Was An Exempt Employee Under the Fair Labor Standards Act, And Is Therefore Not Entitled to Overtime Compensation

Under the Fair Labor Standards Act ("FLSA"), salaried employees are not entitled to overtime compensation if they work in a bona fide executive or administrative capacity, or a combination thereof. Mr. Averza's responsibilities on the Los Angeles Airport and Baltimore County Public Schools projects are sufficient to render him exempt from the overtime provisions of the FLSA under the executive, administrative or combination exemptions. In addition, the duties of his position on the Los Angeles Community Colleges Project satisfy the test set forth under the law and accompanying regulations to qualify him for the administrative exemption.

Accordingly, as an "exempt" employee under the Fair Labor Standards Act, Mr. Averza is not entitled to overtime compensation. Moreover, 3D/I was under no obligation to make wage payments to Mr. Averza under the Maryland Wage Payment and Collection Law, and cannot be held liable for the failure to do so.

      e.      **Mr. Averza Must Reimburse 3D/I for Its Payment of Relocation Expenses**

According to the terms of 3D/I's Policy Guide, if an employee voluntarily terminates his or her employment within 12 months of relocation, he or she must reimburse 3D/I a pro rata share of the relocation expenses. Prior to Mr. Averza's relocation from Los Angeles to Baltimore, Don Thomas of 3D/I informed Mr. Averza that the Company would pay his relocation expenses, up to $5,000, in return for Mr. Averza's one-year employment commitment to the project. Mr. Thomas also informed Mr. Averza that 3D/I would reimburse him for his mileage expenses at $0.325 per mile. Mr. Averza accepted this offer, and relocated to the Baltimore, Maryland area on or about November 29, 2000. 3D/I paid Mr. Averza $4,250.25 to cover his relocation expenses, and reimbursed him for mileage expenses in the amount of $1,043.57, for a total amount of $5,293.82. However, Mr. Averza resigned voluntarily on March 9, 2001, after only approximately three months of employment in the Baltimore, Maryland area, or 25 per cent of the one year required commitment. He therefore owes 3D/I 75 per cent of the $4,250.25 in relocation expenses that it paid to him, which is $3,187.69. By failing to pay 3D/I the agreed-upon portion of his relocation expenses, Mr. Averza has breached his contract with 3D/I, and unjustly accepted the benefit of the Company's payment of those expenses.

3.  **Issues to be abandoned**

    None from the plaintiff.

    None from the defendant.

4.  **Amendments of pleadings**

    None from the plaintiff.

    None from the defendant.

5.  **Damages and calculations thereof by Plaintiff on overtime claim**

    Averza kept a log of his hours, derived from company required time sheets. This log was long ago provided to the defendant. Based on discovery of the Defendant's earnings reports and timesheets, Averza is now able to calculate his damages based upon the company's records, which in turn were derived from his contemporaneously prepared timesheets.

    In narrative form, the calculation is as follows. Averza worked in 3D/I's Los Angeles branch from November 1999 until approximately September 1, 2000, at $48.07/hour. He then received an increase to $49.04 per hour. When he moved to Baltimore, Averza's rate of pay was reduced to $35.58 per hour. The overtime hours expended by Averza between November 1999 through March 2001 are multiplied by his hourly rate times one-and-a-half. In addition, Averza worked through his lunch hours, for which he was never relieved of his duties, throughout his tenure. Averza has prepared tables showing the overtime hours, derived from Defendant's documents, and has added lunch hours. The total overtime due to Averza is $5,443.93 for 1999, $40,395.48 for 2000 and $5,990.78 for 2001.

Averza also seeks liquidated damages for 3D/I's willful failure to pay the overtime compensation, interest, and attorney's fees in accordance with the provisions of the Fair Labor Standards Act.  In addition, under the Maryland Wage Payment and Collection Law, 3D/I is liable for as much as trebled damages in addition to the unpaid wages.  Prejudgment interest is also appropriate on the unpaid wages (prior to imposing liquidated or trebled damages.)  Pursuant to this Court's rules, counsel for Defendant has been provided with quarterly updates of the attorney's fees expended, and a fee application will be filed after the conclusion of the case in the event that judgment is awarded in favor of Averza.

**6.     Damages and calculations thereof by Defendant on counterclaim**

Don Thomas, Program Manager at 3D/I, informed Mr. Averza that 3D/I would pay his relocation expenses of up to $5,000, as well as mileage expenses at a rate of $0.325 per mile, when he relocated from Los Angeles, California to Baltimore, Maryland.  Mr. Thomas informed Mr. Averza that 3D/I would pay his relocation expenses in return for Mr. Averza's one-year employment commitment to the project.  In addition, the terms of 3D/I's Policy Guide state that if an employee voluntarily terminates his or her employment within 12 months of relocation, he or she must pay 3D/I a pro rata share of those relocation expenses.  Mr. Averza kept a record of both his relocation and mileage expenses, and 3D/I reimbursed him for the full amount of $5,293.82, consisting of $4,250.25 for relocation expenses and $1,043.57 for his mileage expenses.

After approximately three months of employment in the Baltimore, Maryland area, Mr. Averza voluntarily resigned from 3D/I on March 9, 2001.  3D/I now seeks a pro rata share of the

relocation expenses it paid to Mr. Averza because of his failure to honor the terms of his agreement with the Company. Mr. Averza worked only three months, or 25 per cent, of the one year required commitment. He therefore owes 3D/I 75 per cent of the $4,250.25 in relocation expenses it paid to him, which is $3,187.69.

**7.     Stipulations Proposed by Plaintiff**

The documents listed as Plaintiff's exhibits are authentic.

The documents listed as Plaintiff's exhibits that were produced by Defendant are admissible.

All documents listed as Plaintiff's exhibits are admissible.

The number of hours listed on Averza's timesheets are accurate.

The two summaries of Averza's damages, attached hereto, are accurately calculated.

The hourly pay rates used in Averza's calculation of the damages due to him on the two summaries are accurate.

The numbers used for hours worked on the two summaries of damages are derived from earnings reports and timesheets prepared by 3DI and produced in this litigation.

In light of the defendant's concern about the confidentiality of its contract with Baltimore County Schools, the witnesses may discuss the contents of the contract without either party being required to admit the contract into evidence, and the best evidence rule will not apply.

**8.     Stipulations Proposed by Defendant**

The documents listed as Defendant's exhibits are authentic.

The documents listed as Defendant's exhibits that were produced by Plaintiff are admissible.

All documents listed as Defendant's exhibits are admissible.

The relocation expenses explained in Defendant's calculation of damages in its counter-

claim are accurate.

**9.     Plaintiff's Exhibits**

| Bates Number | Date | Description | Trial exhibit no. |
|---|---|---|---|
| P0001 | 3/30/01 | Final paystub | |
| P0003-28 | 2000 | pay stubs | |
| P0035-40 | | time sheets | |
| P0041 | 3/9/01 | Notification of termination | |
| P0044-45 | 1/25/01 | Notification of change of status | |
| P0050-58 | 1/7/99 | 3D/I employee manual (the Book) | |
| P0059-61 | 2/01 | emails from Averza to Foster and Waylett re resignation | |
| P0062-64 | 1/01 | emails between Thomas and Murley (among others) regarding whether position is exempt | |
| P0067 | | Memo from Thomas regarding working hours | |
| P0066 | 3/6/01 | email from Kemmel to Merrill re Averza and Baniowski | |
| 3DI-023 | 12/11/00 | Payroll notice re change of pay | |
| 3DI-061 | 8/4/00 | Payroll notice re change of pay | |

| | | |
|---|---|---|
| 3DI-076 | 3/2/01 | emails re Averza leave balance |
| 3DI-081-83 | 3/23/01 | final earnings report |
| 3DI-084 | 12/29/00 | earnings report for December 2000 |
| 3DI-086 | 3/30/01 | direct deposit advice slip for final pay |
| 3DI-087 | 3/27/01 | memo from Averza to Fleishacker and Murley re pay withholding |
| 3DI-088-89 | 3/29/01 | time sheet history report for 2/17/01 to 3/23/01 |
| 3DI-090-091 | 3/29/01 | Employee earnings report, 3/9/01 to 3/23/01 |
| 3DI-107 | 1/31/00 | W-2 for 1999 from 3DI |
| 3DI-108 | 1/31/01 | W-2 for 2000 from 3DI |
| 3DI-109 | 1/31/01 | W-2 for 2001 from 3DI |
| 3DI-113-154 | 5/23/02 | Earnings report for Averza |
| 3DI-155-177 | 5/23/02 | Timesheet history for Averza |
| 3DI-180-248 | various | Employee Timesheets for Averza |

                  Summaries of Averza's timesheets, payments made, and claims made

Plaintiff reserves the right to add additional exhibits to this list if additional documentary evidence is discovered. Plaintiff also reserves the right to use exhibits identified as Defendant's exhibits, exhibits introduced during depositions, and documents produced during discovery. Plaintiff also reserves the right to introduce any exhibit for purposes of impeachment and/or rebuttal.

**10. Defendant's Exhibits**

 **a. Exhibits Defendant Expects to Offer**

1. Background documents from personnel file of Project Manager Joseph Averza re: academic background, professional experience, publications, etc. (3DI 001-002)

2. Background documents from personnel file of Senior Project Manager Joseph Averza re: academic background, professional experience, publications, etc. (3DI 003-005)

3. Email dated September 1, 1999 from Joe Scarano to Lloyd Silberstein re: Joseph Averza (3DI-008)

4. Resume of Joseph Averza (3DI 009-011)

5. Letter dated September 22, 1999 from Lloyd Silberstein to Joseph Averza re: 3D/International offer of employment, agreed to and accepted by Mr. Averza (3DI 006-007)

6. Letter dated November 17, 2000 from Don Thomas to Joseph Averza re: 3D/International offer of employment and relocation assistance (3DI-016)

7. Joseph Averza's Detailed Job Description Summary (3DI 516-534)

8. E-mail dated January 29, 2001 from Joseph Averza to Tasos Valanos re: Meeting Minutes (3DI-536)

9. E-mail dated January 31, 2001 from Joseph Averza to Tasos Valanos re: Meeting Minutes (3DI-535)

10. E-mail dated February 22, 2001, from Joe Averza to Mike Foster and Susanne Waylett re: Request of Reassignment (3DI-020)

11. Timesheets for Joseph Averza during his employment at 3D/I (3DI 180-248).

12. 3D/I Policy Guide (re: reimbursement of relocation expenses) (3DI-179, P0050-P0058)

13. Written receipt and acknowledgement of Policy Book by Joseph Averza (3DI-062)

14. E-mail dated January 15, 2001 from Jenny Murley to Don Thomas re: Overtime Pay For Sub consultant Field Engineers (P0062-0064)

15. Memo from Don Thomas re: Work Hours & Overtime (P0067)

16. E-mail dated November 20, 2000 from Joseph Averza to Marcy Gladden re: Offer Letter (3DI-028)

17. Documents regarding relocation expenses for Joseph Averza (3DI-249-257)

18. Summary statement of relocation expenses for Joseph Averza (P0001)

  b. **Exhibits Defendant May Offer If the Need Arises**

19. Letter dated February 3, 1995, from Henry Hutton, Maryland Port Administration to Joseph Averza re: offering thanks for services provided (3DI-012)

20. Letter dated June 12, 1995 from Kenneth D. Merrill, DKP to Joseph Averza re: offering thanks for services provided (3DI-013)

21. Letter of reference dated November 12, 1996 from James Wills, Flippo Construction Company, Inc. re: Joseph Averza (3DI-014)

22. Letter dated September 22, 1999 from Lee Saylor, Saylor Consulting Group to Joseph Averza re: offering thanks for services provided (3DI-015)

23. Job Description of Senior Project Manager (3DI-017)

24. Notification of Employee Termination for Joseph Averza (3DI-019)

25. Memo dated March 13, 2001 from Joseph Averza to Alan Fleishacker re: Payment of Payroll – BCPS (P0031)

3D/I reserves the right to add additional exhibits to this list if additional documentary evidence is discovered.  3D/I also reserves the right to use exhibits identified as Plaintiff's exhibits, exhibits introduced during depositions, and documents produced during discovery. Defendant also reserves the right to introduce any exhibit for purposes of impeachment and/or rebuttal.

**11.    Witnesses Expected to be Called by Plaintiff**

Joseph Averza, plaintiff

Other witnesses will be presented by deposition testimony, see section 14, below.

Witness who may be called if the need arises:

Marcy Gladden

**12.    Witnesses**

   **a.    Witnesses Expected to be Called by Defendant**

   (1)   Lloyd Silberstein
         c/o Alan Fleishacker, General Counsel
         3D/International, Inc.
         1900 West Loop South
         Suite 600
         Houston, TX  77027
         (713) 871-7006

   (2)   Michael Foster
         c/o Alan Fleishacker, General Counsel
         3D/International, Inc.
         (address listed above)

   (3)   Rebecca Ricks
         c/o Alan Fleishacker, General Counsel
         3D/International, Inc.
         (address listed above)

 (4) Pat Lappin
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

 (5) Fred Baniowski
   c/o Parsons Brinckerhoff
   5405 West Cypress Street
   Suite 209
   Tampa, Florida  33607

 (6) Sue Waylett
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

**b. Witnesses Defendant May Call If the Need Arises**

 (1) Donald Thomas
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

 (2) Chris Weirda
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

 (3) Kelley Mungovan
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

 (4) Jenny Murley
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

 (5) Martha Polise
   c/o Alan Fleishacker, General Counsel
   3D/International, Inc.
   (address listed above)

(6) Lyn Shipp
c/o Alan Fleishacker, General Counsel
3D/International, Inc.
(address listed above)

(7) Phil Kimmel
c/o Parsons Brinckerhoff
5405 West Cypress Street
Suite 209
Tampa, Florida 33607

(8) Ken Merrill
c/o Parsons Brinckerhoff
5405 West Cypress Street
Suite 209
Tampa, Florida 33607

(9) Sonia Renya-Morales
c/o Alan Fleishacker, General Counsel
3D/International, Inc.
(address listed above)

(10) Joseph D. Averza
12614 Cedar Brook Lane
Laurel, MD 20708

3D/I reserves the right to add witnesses to this list, if additional witnesses are discovered. If witnesses are discovered, 3D/I will supplement this list immediately. 3D/I reserves the right to call any witnesses identified by Plaintiff on his witness list, any individual identified in discovery, and any witnesses for rebuttal or impeachment purposes. 3D/I also reserves the right to present witnesses through their deposition testimony.

**13. Expert Witnesses**

Neither side has named expert witnesses.

**14.    Depositions to be offered in evidence by Plaintiff**

Kelley Mungovan – in its entirety

Michael Foster:

    page 6 – through page 7, line 1

    page 9, line 15, through page 21, line 7

    page 24 line 12 through page 35 line 7

    page 35 line 13 through page 136, line 22

    page 149 line 6 through page 157 line 20

    page 161 line 21 through page 171 line 4

Rebecca Ricks – in its entirety

Lloyd Silberstein – page 1 through page 44, line 23

**15.    Depositions that may be offered in evidence by Defendant**

Joseph Averza
Lloyd Silberstein
Michael Foster
Rebecca Ricks
Kelley Mungovan

Counsel have agreed to designate pages and/or lines of any portion of a deposition to be offered in a party's case in chief in advance of trial.

**16.    Other pretrial relief requested**

No other pretrial relief is requested at this time.

19

_____
Mary T. Keating
Federal Bar No. 04265
728 Deepdene Road
Baltimore, Maryland 21210
(410) 532-8900

Attorney for Plaintiff


_____
Maria A. Perugini
Federal Bar No. 12161
Littler Mendelson, P.C.
1225 I Street, N.W., Suite 1000
Washington, DC 20005
(202) 414-6862

Attorney for Defendant


APPROVED:


_____
William D. Quarles, United States District Court Judge


WASHINGTON:99226.1 029925.1003